**WACHOVIA BANK AND TRUST COM-
PANY, Plaintiff,**

v.

**MANUFACTURERS CASUALTY INSUR-
ANCE COMPANY, Defendant.**

**Civ. A. No. C-159-WS-57.**

United States District Court
M. D. North Carolina,
Winston-Salem Division.

March 16, 1959.

370

Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., for plaintiff.

Jordan, Wright & Henson, Greensboro, N. C., for defendant.

STANLEY, District Judge.

This action arises out of a banker's indemnity bond issued by the defendant, Manufacturers Casualty Insurance Company, hereinafter referred to as "Manufacturers", to the City Industrial and Savings Bank of Greensboro, hereinafter referred to as "City Industrial". The plaintiff, Wachovia Bank and Trust Company, hereinafter referred to as "Wachovia", brought this action under the bond as a successor in interest to City Industrial as a result of the merger of City Industrial with Wachovia.

The loss upon which this action is based arose as a result of an embezzlement of funds by a former teller of City Industrial. The embezzlement occurred prior to the merger of City Industrial with Wachovia and the principal question involved is whether the embezzlement was "discovered", in accordance with the bond provisions, prior to the effective date of the merger, at which time the coverage of the Manufacturers' bond expired.

Wachovia was covered by a banker's indemnity bond issued to it by the Hartford Accident and Indemnity Company. This bond contained provisions similar to Manufacturers' bond. Thus, Wachovia was covered by indemnity bonds as to embezzlement losses sustained and discovered both before and after the merger,

and could have recovered against either Manufacturers or Hartford, depending on when the loss was discovered. Wachovia, however, elected to proceed only against Manufacturers. Hartford was made a third-party defendant upon motion of Manufacturers, but at the conclusion of the trial, a motion was granted, without objection on the part of Manufacturers, dismissing the third-party complaint.

The case was tried by the Court without a jury on August 6 and 7, 1958, in Greensboro, North Carolina. At the conclusion of the trial, the Court took the case under advisement pending the receipt of proposed findings of fact, conclusions of law, and supplemental briefs of the parties in support of their contentions. The proposed findings of fact, conclusions of law and briefs of the parties having been received, the Court, after considering the pleadings, evidence, stipulations, exhibits and briefs of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## Findings of Fact

1. The plaintiff is a North Carolina corporation engaged in the banking and trust business, with its principal office located in Forsyth County, North Carolina.

2. The defendant is a Pennsylvania corporation engaged in the insurance business, with its principal office located in Philadelphia, Pennsylvania. It is authorized to do business in North Carolina.

3. The amount in controversy exceeds, exclusive of interest and costs, the sum of $3,000.

4. Under date of March 1, 1955, the defendant issued its Bankers Blanket Bond No. 505966 to City Industrial, in which the defendant agreed to indemnify and hold harmless City Industrial from any losses "sustained by the insured at any time but discovered after noon of the 1st day of March, 1955, and prior to the termination or cancellation of this bond as an entirety, as hereinafter set forth", including "any loss through any dishonest, fraudulent, or criminal act of any of the employees" of the insured. The bond also provided for written notice of loss "at the earliest practicable moment after discovery." The bond was sufficient in amount to cover the loss which gave rise to this action.

5. As of midnight, February 29, 1956, upon a consolidation of the insured, City Industrial, with Wachovia, the aforesaid bond was terminated in accordance with its provisions.

6. Prior to February 29, 1956, a loss in the amount of $17,800 was sustained by the insured, City Industrial, through the dishonest acts of Jerrlyn L. Black, one of its employees.

7. From and after midnight on February 29, 1956, City Industrial and Wachovia were consolidated through the merger of City Industrial with Wachovia. Through said consolidation and merger, the plaintiff became the owner of all the assets of City Industrial, including all rights of City Industrial under the aforesaid bond.

8. The Federal Bureau of Investigation recovered from Jerrlyn L. Black $4,500 of the embezzled funds and delivered same to the United States Marshal for this district. On or about April 22, 1958, the United States Marshal, pursuant to order of this Court, paid to the plaintiff said sum of $4,500. The amount in controversy between the parties is $17,800, the total amount of the embezzlement, less the $4,500, or $13,300, plus interest and cost.

9. Proof of loss in due form was properly filed on April 16, 1956, within the time prescribed in the bond.

10. On February 29, 1956, the day prior to the merger, various personnel of other branches of Wachovia were present at City Industrial to make preliminary examinations prior to the merger which was to become effective as of midnight that date.

11. Edward T. Shipley, the General Auditor of Wachovia, and Hampton E. Morgan, an Auditor of Wachovia, and

Robert F. Goodwin, Comptroller of Wachovia, arrived at City Industrial about 2 o'clock on the afternoon of February 29, 1956. While other Wachovia employees were engaged in examining the loan portfolio and making a cash verification, only Morgan, under the supervision of Shipley, was assigned to checking the savings account ledger cards.

12. Morgan's first task at City Industrial was to run an adding machine tape on the savings account ledger cards while Shipley was to run a trial balance of the general ledger of City Industrial. No previous examination of the savings department of City Industrial had been made by any Wachovia personnel prior to this time.

13. On February 29, 1956, and at all times material to this controversy, W. A. Balsley was President of City Industrial, Connie V. Sutton was Vice-President and Cashier, Claude W. Fleming was Assistant Cashier and a Teller, and Miss Jerrlyn L. Black and Miss Lillian Bush were Tellers.

14. Prior to the merger, the following accounting procedures were employed at the tellers' windows and in the savings department of City Industrial. When either a deposit or withdrawal was to be made by a customer, a deposit or withdrawal slip was supposed to be prepared by the customer and presented to the teller along with the customer's pass book. Each teller would handle all types of transactions that came through the bank, and each teller had an individual cash drawer. At the end of the banking day each teller would total the withdrawal and deposit slips and post these totals to the teller's individual cash book. The individual cash books would in turn be posted to the cash journal. This combined total was in turn posted to the savings account entry in the general ledger. The general ledger contained a daily compilation of the changes in all the assets and liabilities of City Industrial. The posting from the cash journal was one of various entries to be made in the general ledger. The compilation and posting to the cash journal and to the general ledger were generally both done by Miss Bush. The deposit and withdrawal slips, after being posted to the individual cash books, were combined and posted to the savings account ledger cards. There was an individual ledger card for each savings account in the bank. These postings were made either by Fleming or Miss Black. After posting, the withdrawal deposit slips were placed in a filing cabinet. At night, the cash, notes and savings account ledger cards were locked in the safe. None of the other records, including the withdrawal and deposit slips, were locked up at night. The withdrawal and deposit slips were kept in the front of a divider of a filing cabinet drawer until they had accumulated for a period of six weeks to two months. They were then combined, bundled, identified and placed behind the divider in the drawer. They would accumulate there for approximately six months and they would then be stored in other filing cabinets or packaged in cartons in order to make space available in the current file drawer.

15. An adding machine tape of the savings account ledger cards was generally made by Miss Black every two weeks. These tapes were retained only for a very short time and there would never be more than one to four tapes available. These tapes were placed behind the savings account ledger cards until discarded. No physical audit of the bank had apparently ever been made. Cash in the custody of the individual tellers was verified only once a year. While Fleming had some awareness of the desirable banking procedure to verify a teller's cash prior to vacation, Miss Black was away from the bank on vacation from February 18, 1956, to February 27, 1956, and her cash was not verified either before leaving or after returning from vacation.

16. For a period of about six weeks prior to the merger, various workmen were engaged in enlarging the bank in accordance with the merger plans. The wall at the rear of the bank had been knocked out during this period and a

temporary wall installed. A new vault was placed in the bank. This work was in progress during the working day and periodically would continue into the evening after the bank had closed. The work necessitated occasionally moving about the equipment and files of the bank. While there was no evidence that any of the workmen tampered with any of the records, all of the records, except the aforesaid ones locked in the safe, were accessible at night. At the beginning of the week of the merger, at the direction of Sutton, a number of cartons containing withdrawal and deposit slips were removed from the bank and stored in the second floor of a building less than one-half block away from the bank. This was done in order to provide more room in the bank during the merger.

17. After arriving at City Industrial, Morgan ran an adding maching tape on the savings account ledger cards. At the same time Shipley ran a trial balance on the general ledger. The general ledger balanced in that the total assets equaled the total liabilities. However, the individual balances of the savings account ledger cards totaled $661,870.48, while the savings account entry in the general ledger was $660,870.48. Since the savings account ledger cards represented the deposits owed by the bank to its customers, this indicated a discrepancy of $1,000 which the bank owed its customers in excess of the amount shown on the general ledger. Morgan reported this discrepancy to Shipley. Shipley then requested Morgan to check the Christmas Club accounts, which were a separate account item in the general ledger. There was a slight discrepancy of $1 in the Christmas Club account which could be reasonably explained by the small amounts involved in transactions in Christmas Club accounts. Morgan then ran a second tape on a different machine on the savings account ledger cards. This tape also indicated an identical $1,000 discrepancy between the ledger cards and the general ledger. This second tape on the savings account ledger cards was discarded when it showed the identical result.

18. In running the various tapes, many errors were made both in misreading ledger cards and omitting amounts on ledger cards, and each of the tapes had to be adjusted to account for these errors. Morgan and Shipley at first thought the $1,000 discrepancy was caused by misreading an entry on a savings account ledger card. The balance on this ledger card was actually $1,135.22; however, the first figure was partially obliterated by a signature, thus making the balance appear to be $135.22. While examination of the tapes indicated that this obliterated figure was not the cause of the discrepancy, it shows that Morgan and Shipley were looking for a bookkeeping or accounting error as the source of the discrepancy rather than any shortage.

19. Miss Bush, Miss Black and Fleming were present at the bank when Morgan and Shipley arrived. Miss Bush and Miss Black left the bank during the late afternoon. Fleming was present at the bank until after Shipley, Morgan and Goodwin left for Winston-Salem at approximately 8:30 P.M.

20. After the second tape on the savings account ledger cards was run, a check was made in the tray containing the savings account ledger cards to see if there were any previously run tapes available, but none were found. Fleming told Shipley and Morgan that Miss Black had run a tape on February 17, 1956. Morgan then ran an adding machine tape on the savings account ledger cards as of February 17. The result of this tape also showed a $1,000 discrepancy since the balance on the ledger cards totaled $665,391.63, while the general ledger savings account entry showed a total of $664,391.63. The personnel from Wachovia were not fully familiar on February 29 with the detail procedure by which the savings account entry on the general ledger was made.

21. Following the running of the February 17 tape, a check was made in the current file of the savings and withdrawal slips. The slips for the period from January 2, 1956, to February 15,

1956, were not located in the current file. A short search of about fifteen minutes of the bank premises failed to locate these slips. However, no check was made to see if the unlocated slips could be found among the records previously stored in the other building half a block away. Sutton had the key to this building. No one attempted to contact him and no one went to check these records on February 29, 1956.

22. Morgan, Shipley and Goodwin left the bank at approximately 8:30 P.M. to return to Winston-Salem. At this time Fleming was the only employee of City Industrial aware of the discrepancy between the adding machine tape and the general ledger entry, and the fact that some withdrawal and deposit tickets had not been located at the bank on February 29, 1956. Sutton knew only of the adding machine discrepancy between the ledger cards and the general ledger, and Balsley was unaware of any discrepancy.

23. Balsley left the bank sometime early in the afternoon of February 29, 1956, and Sutton left about 7 P.M., prior to the departure of Morgan, Shipley and Goodwin. Balsley and Sutton were at their homes in Greensboro after departing from the bank. Both had telephones in their homes. No one attempted to contact them from the bank after their departure.

24. Morgan took the savings account ledger cards with him when he left the bank on the evening of the 29th, for the purpose of having them microfilmed. The ledger cards were microfilmed in Winston-Salem that evening and returned to the bank in Greensboro the next morning before business hours.

25. The microfilms were sent to the Eastman Kodak Company to have verification forms prepared to be sent to the individual customers. These verification forms upon being received from the Eastman Kodak Company were mailed out to customers in the regular course of business. It was the intended policy of Wachovia to mail account verification forms to all customers whether the accounts had balanced or not on the 29th.

Customer verification is the most practicable way of making a physical audit of a bank, and this was to be done at sometime as part of the merger arrangements. Part of the statement printed on the verification form was "to assist us with our regular examination of the savings department, it will be appreciated if you will confirm the correctness of the final balance indicated * * *"

26. After the merger, effective midnight the 29th of February, 1956, Shipley and other Wachovia personnel continued their examination of the accounts of the former City Industrial. The actual embezzlement was discovered when Shipley several days later noted that on two savings account ledger cards there were entries made without the dates being in chronological order. Upon being notified of this, Balsley made direct verification with the customers whose accounts were involved. The funds had been embezzled over a period of time from May, 1955, to February 15, 1956. The embezzlement totaled $17,800, of which $14,300 was taken after January 2, 1956. Miss Black had attempted to cover the shortages by two withdrawal entries on two savings account ledger cards. On the ledger card of Nancy S. Neese, a withdrawal entry of $10,000, dated January 9, 1956, was made. On the savings account ledger card of E. A. Morris, there was a withdrawal entry of $6,800, dated January 9, 1956. On both the Neese and Morris cards there was an entry for a tax deduction dated January 13, 1956, prior to the withdrawal entries. If these entries had been proper, the January 13 entries should have followed the January 9 entries instead of preceding them.

27. Had the two concealing entries, dated January 9, 1956, not been made, the savings account ledger cards would have shown a discrepancy of $17,800. While no one could be sure as to why Miss Black did not make concealing entries to cover the entire shortage, it can reasonably be assumed that her failure to do so was due to some mechanical error on her part in determining the exact amount of her shortage.

28. Miss Bush, Miss Black and Fleming were told on March 6 that there was a shortage and asked individually if they had taken the money. Each denied having taken the money and they were all suspended until the actual embezzler could be determined. The Federal Bureau of Investigation was notified of the shortage on March 6, 1956, and Manufacturers was notified of the shortage by letter dated March 7, 1956.

29. In the light of sound accounting and banking practices, the internal controls and accounting practices followed by City Industrial prior to the merger with Wachovia were somewhat loose and inadequate.

30. None of the officials of Wachovia made any statement to Balsley on the morning of March 1, 1956, concerning the discovery of any loss due to embezzlement. Sometime during the morning of March 1, Sutton stated to Balsley that the Wachovia officials were looking for a $1,000 error. Sutton expressed the belief that he could discover the error in a short time.

### Discussion

 The liability of the defendant for the loss in question depends on whether or not the loss was "discovered" prior to the termination of the defendant's bond at midnight on February 29, 1956. In making this determination, the following legal principles are applicable:

1. A discovery provision in a bond limiting liability to losses discovered prior to the termination of the bond is valid and enforceable. The contract must be construed the way the parties have plainly written it. The act or default of an employee giving rise to a loss must be discovered within the time specified in the bond, regardless of whether discovery of the loss is prevented by a fraudulent concealment by an employee. 45 C.J.S. Insurance § 804; 50 Am.Jur., Suretyship § 345; 11 Appleman, Insurance Law and Practice, § 6979; Chicora Bank v. United States Fidelity & Guaranty Co., 1931, 161 S.C. 33, 159 S.E. 454, 77 A.L.R. 857.

2. Burden of proof is on the plaintiff to establish by a preponderance of the evidence that the loss for which recovery is sought was due to a defalcation discovered within the time specified in the policy.

3. The word "discovery" is not new or of recent terminology in indemnity contracts such as the one involved in this litigation. When such a word has been the subject of repeated interpretation by the courts, there is a presumption that the parties using the word in a clause of a similar contract understood its meaning to be in accordance with the interpretation by the courts. 13 Appleman, Insurance Law and Practice, § 7404; 44 C.J.S. Insurance § 293.

4. The general rule in the construction of insurance contracts is that ambiguous provisions are to be construed most strongly against the insurer. If there are two reasonably susceptible constructions of the contract, one favorable to the insured and the other favorable to the insurer, the construction favorable to the insured, if consistent with the purposes for which the contract was given, must be adopted. However, there must be some ambiguity in the contract before this rule is applicable. Bank of Tarboro v. Fidelity & Deposit Co., 1901, 128 N.C. 366, 38 S.E. 908, citing American Surety Company v. Pauly, 1898, 170 U.S. 133, 18 S.Ct. 552, 42 L.Ed. 977.

5. In order to constitute a "discovery" in accordance with the terms of the policy under consideration, there must be facts known, at the time it is asserted that the discovery was made, which would lead a reasonable person to an assumption that a shortage existed. The facts must be viewed as they would have been by a reasonable person at the time discovery is asserted, and not as they later appeared in the light of subsequently acquired knowledge. While it is not necessary that the exact amount or details of a loss be known to constitute a discovery, the mere discovery of certain facts which later lead to other facts which reveal the existence of a shortage does not necessarily constitute a dis-

covery. Knowledge available to the insured must rise above a mere suspicion of loss. The fact that an investigation after the termination of the policy leads to the disclosure of an actual defalcation does not raise a previous suspicion to the level of a discovery. Inefficient business procedures, or irregularities and discrepancies in accounts, if as consistent with the integrity of employees as their dishonesty, does not constitute a discovery, even though dishonest acts may later be found to exist. 50 Am.Jur., Suretyship §§ 345–348, 45 C.J.S. Insurance § 804, 11 Appleman, Insurance Law and Practice § 6979, Forest City Building & Loan Ass'n v. Davis, 1926, 192 N.C. 108, 133 S.E. 530; Massachusetts Bonding & Ins. Co. v. Norwich Pharmacal Co., 2 Cir., 1927, 18 F.2d 934.

■ In applying these legal principles to the facts herein found, it is clear that the loss was not discovered prior to midnight on February 29, 1956, the time the defendant's bond was terminated.

It is apparent that the internal controls and accounting practices at City Industrial prior to the merger were not in accordance with strict banking practices. This, however, is not uncommon in small banks such as City Industrial. While inadequate internal controls and accounting practices may have facilitated defalcation by an employee, they also increased the possibility of errors in the record.

■ It is a matter of common knowledge that books and accounts are frequently found to be out of balance, and that errors occur in many ways. After the tapes of the savings account ledger cards failed to balance with the general ledger, Wachovia employees made no further detailed examination of the records on February 29, 1956, and left the bank without further investigation. While some withdrawal and deposit slips were not located on the premises, no attempt was made to examine the records stored in another building.

It is significant that on February 29, 1956, Balsley, the President of City Industrial, and Sutton, its Vice-President, had no suspicion of the possibility of a shortage. Fleming, the Assistant Cashier, knew only what the Wachovia personnel told him and what he observed of their preliminary examination. When Shipley and Morgan left for Winston-Salem on the evening of February 29, they left Fleming behind in the bank with access to the records. If a shortage had been uncovered on February 29, Fleming would have been a prime suspect because of his position in the bank and daily contact with the bank records.

It is important to keep in mind what was known by the various persons present at City Industrial on the late afternoon and evening of February 29, 1956, and care must be taken to exclude facts that became known after that time. All that was known on February 29 by Shipley and Morgan was that a preliminary examination revealed a discrepancy of $1,000 between an adding machine tape of the ledger cards and the savings account entry in the general ledger and that some of the deposit and withdrawal tickets could not be readily located in the place they were customarily kept. Both knew that some of the records had been removed to another building, but no effort was made to check these records. They were not fully familiar with the accounting and posting procedures used in the savings department of City Industrial. They made no effort prior to their departure for Winston-Salem to contact either Balsley or Sutton, the principal officers of City Industrial, who were at their homes in Greensboro and available by telephone.

Viewing the facts known on February 29, 1956, in light of the usual degree of confusion that would result from the presence of workmen on City Industrial premises for several weeks prior to the merger, and the fact that some of the records had been temporarily stored in another building during the merger period, and other relevant factors, it is clear that on that date the probability of a bookkeeping error was just as great, if not more probable, than the existence of

a shortage through defalcation of an employee.

In view of the above, it is concluded that the plaintiff has failed to sustain the burden of proof by a preponderance of the evidence that the loss was discovered prior to midnight on February 29, 1956.

Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter herein.

2. The loss in question was not discovered prior to the termination of the defendant's indemnity bond.

3. The plaintiff is entitled to recover nothing of the defendant, and the plaintiff's complaint should be dismissed with prejudice.

Counsel for the defendant will submit to the Court an appropriate judgment.