487 P.2d 437

**MARYLAND CASUALTY COMPANY, a corporation, Home Indemnity Company, a corporation, Appellants,**

v.

**C. A. CLEMENTS and E. Ray Cowden, co-partners, to the use and benefit of C. A. Clements et al., Appellees.**

No. I CA–CIV 1063.

Court of Appeals of Arizona,
Division 1,
Department B.

July 28, 1971.

Rehearing Denied Oct. 4, 1971.

Review Denied Nov. 9, 1971.

Jennings, Strouss & Salmon by Lee E. Esch and William F. Haug, Phoenix, for appellant Home Indemnity Co.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Robert G. Beshears and David L. Haga, Phoenix, for appellant Maryland Casualty Co.

Snell & Wilmer by John E. Lundin, Phoenix, for appellees.

HAIRE, Judge.

Several questions are presented on this appeal from the judgment entered by the trial court against the defendant-appellant fidelity insurers. Appellant Maryland Casualty Company (Maryland) raises five specific questions, with appellant Home Indemnity Company (Home) joining as to the first question only.

We will first discuss the mainstream facts relevant to the question raised by both appellants. This question concerns whether prior to the issuance of the fidelity policies here involved, the plaintiff-insureds had knowledge of past fraudulent or dishonest acts committed by one of their employees, defendant Mike Harris. The parties all admit that if such knowledge existed, then because of pertinent policy provisions there was no coverage for the subsequent defalcations of the employee Mike Harris which are the subject of the lawsuits here involved.

Four separate actions were filed involving the corporate plaintiff, Maricopa Drug Co., Inc., and C. A. Clements and E. Ray Cowden, co-partners, dba Westwood Pharmacy,[1] as plaintiffs against defendants Mike and Louise Harris, and the appellant fidelity insurers, Maryland and Home, to recover losses arising out of acts of the Harrises while employed by the partnership and the corporation. These four separate actions were consolidated for trial, and resulted in the entry of judgment against the Harrises and the appellant insurers. The Harrises are not parties to this appeal.

---

1. The plaintiff co-partners styled the caption of their complaint as "C. A. Clements and E. Ray Cowden, co-partners, to the use and benefit of C. A. Clements, E. Ray Cowden and Mike Harris, formerly doing business as Westwood Pharmacy."

The evidence shows that in 1951, plaintiffs C. A. Clements and E. Ray Cowden, and defendant Mike Harris formed a partnership for the operation of a drug store business. Defendant Harris was a pharmacist and assumed the duties of pharmacist and manager of the store. This business was incorporated in 1958 as Maricopa Drug Company, Inc., with Harris, Cowden and Clements initially, and at all pertinent times thereafter, serving as president, vice-president and secretary-treasurer respectively. The corporation, Maricopa Drug Company, Inc., is the corporate plaintiff here involved.

In 1956 these same three individuals formed a second partnership for the operation of a different drug store business and commenced doing business as Westwood Pharmacy. Defendant Mike Harris was also an active partner in the Westwood Pharmacy operation at all times pertinent to this appeal. The responsibility for daily record-keeping for both the corporation and partnership stores was mainly assumed by Louise Harris, the wife of the defendant Mike Harris. Mrs. Harris' duties included posting transactions to the sales journal, the check ledger and the accounts payable ledger. At the end of each month Mrs. Harris would give the sales journal, check and accounts payable ledgers to Mr. Clements, who would then post to the general ledger and prepare the profit and loss statement.

In June of 1963 facts came to the plaintiffs' attention which eventually resulted in the termination by plaintiffs of the employment of defendants Mike and Louise Harris on July 9, 1963. An audit of the plaintiffs' books was commenced, and in September 1963 a completed audit report was received from Dennis, Parker & Schmich, a firm of certified public accountants. That audit reflected that during the time periods covered by appellants' policies, the defendants Mike and Louise Harris, acting in collusion, had engaged in a practice of taking funds from the businesses and concealing these defalcations by false and misleading accounting entries.

Prior to the time of the incorporation of Maricopa Drug, defendant Mike Harris customarily followed the practice of drawing partnership funds from time to time for his own personal use, noting the withdrawals on the accounts receivable ledger in the name of Mike Harris, which draws would ultimately be applied against his earnings from the partnership. Subsequent to the incorporation of Maricopa Drug, defendant Mike Harris to a limited extent continued this course of conduct, notwithstanding the fact that he was told by plaintiff Clements that "this was a corporation and that we would have to wait until the end of the year to see what the profit figure looked like before we could make any distribution like that." Defendants point to six specific instances commencing in 1958 and extending over a two year period where defendant Mike Harris withdrew corporate funds for his personal use, notwithstanding that he had been advised by plaintiff Clements that this was improper and should not be done. At the time of each of these withdrawals the Harrises made appropriate notations in the corporate books so as to reflect the withdrawals as accounts receivable from Mike Harris, with no attempt at concealment. These withdrawals were all repaid by offset against corporate bonuses or otherwise, and do not in any way constitute a part of the claims asserted by plaintiffs in this litigation. However, defendants contend that plaintiff Clements' admitted knowledge of these transactions constituted undisclosed knowledge of prior dishonest acts committed by Mike Harris sufficient to invalidate coverage. Plaintiff Clements testified that while he knew of these withdrawals by Harris, he did not feel that there was anything dishonest in what Harris had done. There is no contention that Clements had knowledge of any prior withdrawals by Harris which Harris concealed or attempted to conceal.

Based upon the foregoing facts the trial court held that the plaintiffs did not have knowledge of prior "fraudulent or dishonest" acts by Mike Harris, and that

therefore there was coverage under the policies. We agree.

■ The defendants do not contend that plaintiffs knew of any prior "fraudulent" acts committed by Harris, but do contend that the plaintiffs had sufficient knowledge so that they should have recognized or characterized his acts as "dishonest". In analyzing the problem presented we have considered the many decisions submitted by both counsel and do not find any of them particularly helpful, since none present fact situations which are sufficiently analogous to serve as a basis for comparison with the material facts here involved. However, certain principles do emerge from the various decisions, which shed some light on the perspective which the Court must take in considering this question. First, the fact that plaintiff Clements might not have actually recognized or subjectively characterized defendants' acts as "dishonest" is not necessarily dispositive. Rather, the question in such a situation is whether Clements, as a reasonable person, based upon the facts known to him at that time, *should* have perceived that the acts were "dishonest". Wachovia Bank & Trust Co. v. Manufacturers Casualty Insurance Co., 171 F.Supp. 369 (M.D.N.C. 1959); *see* Ciancetti v. Indemnity Insurance Co. of North America, 168 Cal.App. 2d Supp. 785, 335 P.2d 1048 (Super.Ct.App. Dep't.1959). Second, in considering the matter from the viewpoint of whether the insureds *should* have recognized the known acts as being dishonest, there exists a presumption of honesty, Salley Grocer Co., Inc. v. Hartford Accident & Indemnity Co., 223 So.2d 5 (Ct.App.La.1968), or, as stated in Wachovia, *supra*, such known acts " * * * if as consistent with the integrity of employees as their dishonesty, does not constitute a discovery [of dishonesty], even though dishonest acts may later be found to exist." 171 F.Supp. at 376.

In the case at hand the defendant Mike Harris and the individual plaintiffs had engaged in a lengthy, well established informal relationship as partners, where it had become customary for him to withdraw company funds for his own use to be repaid from future profit distributions. After incorporation this practice was continued by the defendant notwithstanding plaintiffs' advice to him that this practice shouldn't be followed under the new corporate setup. Moreover, there was a continued open disclosure of these personal draws without any attempt at concealment and with later repayment thereof. Under these circumstances we cannot say, as a matter of law, that plaintiffs should have recognized these acts as dishonest, if dishonest they in fact were. Webster's Third New International Dictionary 1086 (P. Grove ed. 1969) defines "honest" as "free from fraud or deception", and "dishonest" as "characterized by lack of truth, honesty, probity, or trustworthiness or by an inclination to mislead, lie, cheat or defraud". *Id.* at 650. Many cases could be cited, dissected and analyzed as to their discussion and treatment of the word "dishonest" as used in fidelity bonds. *See, e. g.*, Waite v. Standard Accident Insurance Co., 132 Mont. 220, 315 P.2d 989 (1957); Sade v. National Surety Corp., 203 F.Supp. 680 (D.D.C.1962); Salley Grocer Co., Inc. v. Hartford Accident & Indemnity Co., 223 So.2d 5 (Ct.App.La.1968); Sherwood & Roberts-Kennewick, Inc. v. St. Paul Fire & Marine Insurance Co., 322 F.2d 70 (9th Cir. 1963); Mortgage Corporation of New Jersey v. Aetna Casualty & Surety Co., 19 N.J. 30, 115 A.2d 43 (1955). *See also* 12A Words & Phrases pp. 413–420. However, we think that the thread running throughout is that while criminal acts are not required, still there must be some conduct from which can be implied an intent to deceive, cheat or defraud. Such conduct is evident in all the cases relied upon by appellants.

■ Appellants complain that plaintiffs would apply different rules in determining whether acts prior to coverage were dishonest and in finding dishonesty after issuance so as to come within the coverage of the policy. The simple answer is that appellants apparently do not recognize that two entirely different questions are involved.

In determining an employer's knowledge of prior acts, the question usually is not whether in light of the facts, including the employee's subjective intent, the employee's acts were *in fact* dishonest, but rather whether *based upon the facts known to the employer*, the employer should reasonably have perceived the dishonesty. In the coverage situation an entirely different yardstick applies—were the acts *in fact* dishonest? As stated in City Loan & Savings Co. v. Employers' Liability Assurance Corp., Ltd., 249 F.Supp. 633, 658 (N.D.Ohio 1964):

> "Knowledge or discovery of dishonesty does not depend upon knowledge of the total misconduct when viewed in retrospect and with the obvious advantages of hindsight, but rather upon knowledge of facts which, in the light of proven circumstances surrounding those facts and in the light of reasonable inferences which can be drawn from those facts, would inform the ordinary, reasonable and sensible employer that dishonesty has occurred which might involve the surety in liability."

■ In conclusion, we find reasonable support in the evidence for the trial court's finding that plaintiffs had no notice or knowledge of prior acts of dishonesty of Mike or Louise Harris prior to the discovery of the complained of losses. *A fortiori*, we are unable to say that such finding by the trial court was "clearly erroneous". *See* Rule 52(a), Rules of Civil Procedure. Since appellant Home Indemnity Company has not raised any other question on appeal, the trial court's judgment against Home must be affirmed.

The remaining questions relate solely to the liability, or extent of the liability, of Maryland Casualty Company. Maryland's next contention is that it is not liable because of the failure of the insureds to file proof of loss within the time specified in Maryland's policy. The pertinent policy provisions are as follows:

> "8. * * * Upon knowledge or discovery of loss or of an occurrence which may give rise to a claim for loss, the Insured shall: (a) give notice thereof as soon as practicable to the Company or any of its authorized agents and * * * (b) file detailed proof of loss, duly sworn to, with the Company within four months after the discovery of loss.

> * * * * * *

> "No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy * * *."

Maryland does not contend that plaintiffs failed to give *notice* of the discovery of possible losses "as soon as practicable", as required by the policy. Rather, emphasis is placed upon the plaintiffs' alleged failure to "file detailed proof of loss" within four months after the discovery of loss. Considerable discussion might be devoted to the meaning of the words "discovery of loss" as applied to this employee fidelity fact situation evolving from an initial general loss of confidence in the employee, to a discovery of isolated unexplained, suspicious transactions, and then some two months later culminating in a certified public accountant's audit report detailing over a hundred defalcations by such employee. However, we do not consider it necessary to determine precisely the meaning of these words insofar as concerns establishing an exact point in time which can be utilized as a discovery point, because, as will be shown by facts hereinafter set forth, plaintiffs *substantially complied* with the policy proof of loss provisions within four months from the earliest possible discovery date that could be urged by Maryland. *See* Truck Insurance Exchange v. Hale, 95 Ariz. 76, 386 P.2d 846 (1963).

■ Before proceeding further, it should be noted that there are no policy provisions requiring that any specific "proof of loss" forms be utilized, the only requirement being that there be filed "detailed proof of loss, duly sworn to". Under such circumstances there is no legal requirement that the insured use proof of loss forms supplied by the insurer. Overland-

Arizona Co. v. California Insurance Co. of San Francisco, 35 Ariz. 115, 274 P. 784 (1929). On September 15, 1963, well within four months subsequent to July 9, 1963, the date of the initial discovery of any hint of employee dishonesty, the plaintiffs submitted to Maryland the audit report prepared by the certified public accountants. This audit report set forth each claimed defalcation explaining in detail how and when it occurred. Prior to that time, on July 12, 1963, Maryland had been given notice of the possibility that a loss had occurred, and Maryland was kept continually advised of the progress of the investigation. It is true that in July Maryland mailed its own proof of loss forms to plaintiff Clements. However, Maryland never indicated in any way that the detailed audit report was not sufficient as a proof of loss, nor do we believe that any valid objection could have been made, other than the possible objection that it was not "duly sworn to". In fact, plaintiff did, on January 3, 1964, mail proof of loss to Maryland on Maryland's own forms, and this was accomplished by merely attaching the audit report to the claim forms and signing the same. Thus the same detail included in the audit report eventually made up the detail of the formal proof of loss form. In our opinion, these facts show substantial compliance with the policy provisions relating to proof of loss, and that is all that is required to prevent forfeiture of the coverage afforded by the policy. Truck Insurance Exchange v. Hale, 95 Ariz. 76, 386 P. 2d 846 (1963).

■ There is nothing in the evidence that tends to show any hint of prejudice resulting to Maryland from plaintiffs' substantial (as opposed to full and complete) compliance with the proof of loss provisions. The absence of such prejudice furnishes an additional basis for the denial of Maryland's contention. It was early established in Arizona that the failure to give timely notice of loss in the absence of an express policy provision providing a specific penalty for failure to give such notice, did not relieve the insurer of liability unless it appeared that the insurer was prejudiced by such failure. Watson v. Ocean Accident & Guarantee Corporation, 28 Ariz. 573, 238 P. 338 (1925) ; Massachusetts Bonding & Insurance Co. v. Arizona Concrete Co., 47 Ariz. 420, 56 P.2d 188 (1936). In Lindus v. Northern Insurance Co. of New York, 103 Ariz. 160, 438 P.2d 311 (1968), the Arizona Supreme Court extended the *Watson* rule, so that now it covers situations involving policies with specific penalty provisions. Thus, while it might be contended that in the case at hand the above-quoted provisions of paragraph 8 of the policy do provide an express penalty for such failure, this is immaterial in the absence of evidence that the failure to make a timely showing of loss was prejudicial to the insurer. The burden is upon the insurer to show such prejudice. Lindus v. Northern Insurance Co. of New York, 103 Ariz. 160, 438 P.2d 311 (1968). We therefore hold that the alleged untimely filing by plaintiffs of the proofs of loss does not operate to release Maryland from liability under its policy. Having so held, it is unnecessary for us to consider plaintiffs' contention that the submission on January 3, 1964 of proof of loss on Maryland's forms was in fact a submission to Maryland within four months after actual "discovery of loss" within the meaning of that term as used in the policy.

Maryland next contends that the maximum coverage under its policy for dishonest acts committed by the defendants Mr. and Mrs. Harris, acting in collusion, was $10,000, rather than $20,000 as found by the trial court. In discussing this contention it is well to keep in mind the admitted fact that here we do not have a situation where two employees have separately and independently taken funds from their insured employer, each in an amount in excess of $10,000. Rather, defendants Mike and Louise Harris admittedly acted in collusion in taking the funds in question.

The trial court concluded as a matter of law that under Maryland's policy provisions " * * * where loss has been sustained by the dishonest acts of two identi-

fied employees, the limit of liability under the policy is $20,000.00." The trial court's conclusion might well be correct as far as it goes. However, we think that the maximum coverage under the policy is $10,000 when the fact is added that these two identified employees were not acting independently, but rather were acting in collusion with each other.

Insuring Agreement I of Maryland's policy provides coverage for "loss * * * to an amount not exceeding in the aggregate the amount stated in the Table of Limits of Liability [$10,000] * * * through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others." Breaking this provision down into its component parts, it seems clear that it was intended to provide a maximum coverage of $10,000 for (1) loss sustained when one of the employees was acting alone, or (2) for loss sustained as a result of employees acting in collusion. If it could be contended that the foregoing provision was ambiguous as to the coverage afforded for a loss sustained when two employees act together, paragraph 11 entitled "Limits of Liability" provides additional guidance. It states that "[t]he company's *total liability* * * * under Insuring Agreement I [Employee Dishonesty Coverage] *for all loss* caused by any Employee or *in which such Employee is concerned or implicated* * * * is limited to [$10,000]." (Emphasis supplied).

The provisions of paragraph 4, hereinafter quoted, relied upon by plaintiffs are not at all inconsistent with the above-quoted provisions of Insuring Agreement I and paragraph 11. Paragraph 4 reads as follows:

"4. *Loss Caused by Unidentifiable Employees.* If a loss is alleged to have been caused by the fraud or dishonesty of any one or more of the Employees *and the Insured shall be unable to designate the specific Employee or Employees causing such loss,* the Insured shall nevertheless have the benefit of Insuring Agreement I, * * * provided that the evidence submitted reasonably proves that the loss was in fact due to the fraud or dishonesty of one or more of the said Employees, *and provided, further, that the aggregate liability of the Company for any such loss shall not exceed the Limit of Liability applicable to Insuring Agreement I.*" (Emphasis supplied).

It will be noted that the foregoing provision expressly negatives any possibility that the insurer could successfully contend that a loss caused by an unidentified employee or unidentified employees would not come under the coverage of the policy. However, although coverage is provided for such a loss, it is expressly provided that even though more than one unidentified employee is involved, coverage for any such loss shall not exceed $10,000. Plaintiffs argue that since paragraph 4 imposes an express limitation of coverage where two or more *unidentified* employees are involved, there is no such limitation when *identified* employees are involved. In this connection, plaintiffs rely upon Shaw v. Metropolitan Casualty Insurance Co. of New York, 62 F.2d 133 (5th Cir. 1933), as establishing the principle that when losses are caused by two *identified* employees, even though acting in collusion, the maximum coverage is to be multiplied by the number of employees involved. However, while the policy involved in Shaw did contain a provision similar to paragraph 4 of the Maryland policy limiting coverage when losses are caused by two or more unidentified employees, it did not contain such express limiting provisions as are set forth in Insuring Agreement I and paragraph 11 of Maryland's policy, limiting coverage for identified employees acting in collusion. Because of the difference in policy provisions, Shaw provides no guidance here. Likewise, because of differing facts and policy provisions, Leader Clothing Co. v. Fidelity & Casualty Company of New York, 237 F.2d 7 (10th Cir. 1956), and Commercial Standard Insurance Co. v. Liberty Plan Co., 283 F.2d 893 (10th Cir. 1960), both cited by Maryland, are not in point.

■ This Court recognizes that it has often been stated that ambiguous provisions in insurance policies are to be construed against the insurer. However, this principle becomes applicable only when, after considering all the provisions of the policy, it is not possible for the court to ascertain the meaning of the language used when applied to the facts before the court. Here there is no such ambiguity. The policy language clearly limits coverage to $10,000 for an "act or acts" committed by employees acting in collusion. We therefore conclude that the coverage here afforded by Maryland's policy was limited to $10,000.

An additional question is raised by Maryland relating to the coverage of its policy insofar as concerns Westwood Pharmacy, the partnership operation. It will be recalled that the defalcations were the result of the joint and collusive efforts of defendants Mike and Louise Harris, and that at the time of the defalcations Mike Harris was employed as the managing partner of the partnership and that his wife Louise was employed as the bookkeeper. The trial court found Maryland liable for $1,287.48 for funds taken from the partnership by Mike and Louise Harris during the period Maryland's policy was in effect. Maryland contends that its policy afforded no coverage for acts of either a partner or an employee acting in collusion with that partner. We agree.

Paragraph 2 of Maryland's policy is an exclusionary provision reading as follows:

"This Policy does not apply:

"(a) to loss due to any fraudulent, dishonest or criminal act by any Insured or a partner therein, whether acting alone or in collusion with others;"

Notwithstanding the rather clear import of this language of paragraph 2, plaintiffs contend that the language is rendered ambiguous when considered with paragraphs 7 and 15 of the policy. The provisions relied upon by plaintiffs read as follows:

"The coverage of Insuring Agreement I shall not apply to any Employee from and after the time that the Insured or any partner or officer thereof not in collusion with such Employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise, whether such act be committed before or after the date of employment by the Insured."

"Insuring Agreement I shall be deemed canceled as to any Employee: (a) immediately upon discovery by the Insured, or by any partner or officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee; * * *."

■ Plaintiffs contend that if dishonest acts of an employee acting in collusion with a partner come within the paragraph 2 exclusion as contended by Maryland, the above-stated provisions become meaningless. We do not agree. The function of the quoted provisions of paragraphs 15 and 7 is to make certain that discovery of dishonest acts, which under pertinent policy provisions result in cancellation of *all* future coverage as to the dishonest employee, will not be imputed to the insured when discovery occurs through a partner acting in collusion with the employee. In such a discovery situation, the coverage afforded by the policy, whatever it might be, remains effective. There well might be many past or subsequent dishonest acts by the same employee, acting independently and without collusion with a partner, and as to such acts the policy would provide coverage. However it does not follow that the intent of these policy provisions was to extend policy coverage and override the express exclusionary language of paragraph 2, nor do they in any way conflict with the language of paragraph 2. Here, under the admitted facts, the defendant partner Mike Harris and his wife acted jointly and collusively. We hold that under such circumstances the policy excludes coverage for the partnership losses.

■ The final question which must be considered on this appeal relates to Mary-

land's contention that the trial court erred in holding that Maryland was liable for interest on each specific defalcation from the time such funds were wrongfully taken by the Harrises. Maryland urges that (1) the claims were unliquidated and therefore there could be no liability for interest prior to judgment, or (2) if the claims were liquidated, then under the terms and conditions of the policy no interest became payable until ninety days after the required proofs of loss were filed, since Maryland had no obligation to pay prior to that time. On the other hand, plaintiffs urge that the claims were fully liquidated, and that interest was due from the time of defalcation because interest was part of the loss or damage insured against. The consideration of these varying contentions regarding the payment of interest requires the Court to distinguish between, on the one hand, interest which is owed as a part of the fundamental obligation of the insurer because it is a loss or damage insured against, and, on the other hand, interest which is chargeable against the insurer because of its failure to pay when due the amount it was liable to pay under its policy. *See* Social Security Administration, Baltimore Federal Credit Union v. Employers Mutual Liability Insurance Co. of Wisconsin, 234 Md. 493, 199 A.2d 918 (1964). This distinction is important because interest which is part of the loss insured against cannot, together with other claimed losses, be awarded in excess of policy limits. However, interest imposed as a penalty because of the insurer's default is independent of, and is not limited by, the limit on policy coverage. Social Security Administration, Baltimore Federal Credit Union v. Employers Mutual Liability Insurance Co. of Wisconsin *supra*.

We find no language in the policy, nor any Arizona decisions which give concrete guidance as to whether Maryland's policy includes interest on the monies wrongfully taken as a part of the loss insured against. The following authorities from other jurisdictions hold that interest is part of the loss insured against. Edmunds-Bouvier Savings & Loan Association v. New Amsterdam Casualty Co., 389 Pa. 79, 132 A.2d 181 (1957); Social Security Administration, Baltimore Federal Credit Union v. Employers Mutual Liability Insurance Co. of Wisconsin, 234 Md. 493, 199 A.2d 918 (1964); Hack v. American Surety Co. of New York, 96 F.2d 939 (7th Cir. 1938). We have previously held in this opinion that the maximum coverage afforded by Maryland's policy for the defalcations here involved was $10,000 and not $20,000 as held by the trial court. In view of the fact that the amounts taken from Maricopa Drug during the bonding period covered by Maryland's policy totaled $13,-404.03, we need not decide whether Maryland's policy coverage included interest as a part of the loss insured against, because even if such interest were covered, the policy limits of $10,000 would preclude recovery thereof. However, this does not dispose of the question of Maryland's possible liability for interest charged as a result of Maryland's alleged failure to pay the covered losses when due. We are of the opinion that the claims here involved were liquidated claims. King Realty, Inc. v. Grantwood Cemeteries, Inc., 4 Ariz.App. 76, 417 P.2d 710 (1966). In fact, it would be hard to conceive of any disputed claim which could be more liquidated than these claims measured by and based upon funds wrongfully taken from the plaintiffs. However we do agree with Maryland that any interest liability which it might have by reason of its alleged wrongful refusal to pay plaintiffs' claim when due, did not accrue until the obligation arose under its policy to pay plaintiffs claims, that is, ninety days after the submission of proofs of loss.[2] Forest City Building & Loan As-

2. Paragraph 8 of the policy reads in part as follows:

"No action shall lie against the Company unless, as a condition precedent thereto, there shall have been full compliance with all the terms of this Policy, nor until ninety days after the required proofs of loss have been filed with the Company * * *."

sociation v. Davis, 192 N.C. 108, 133 S.E. 530 (1926); Aetna Casualty & Surety Co. v. Peoples Building & Loan Association, 194 Ark. 773, 109 S.W.2d 943 (1937); Lemay Ferry Bank v. New Amsterdam Casualty Co., 347 Mo. 793, 149 S.W.2d 328 (1941); Hartford Accident & Indemnity Co. v. Collins-Dietz-Morris Co., 80 F.2d 441 (10th Cir. 1935). Here, Maryland became obligated to pay ninety days after September 15, 1963, the date plaintiffs substantially complied with the proof of loss requirement. Plaintiffs are entitled to the legal rate of interest on the policy limits, $10,000, from and after the expiration of said ninety day period.

The judgment of the trial court against Home Indemnity Co. is affirmed. The judgment against Maryland is reversed and the matter is remanded for entry of a modified judgment against Maryland consistent with this opinion.

JACOBSON, P. J., and EUBANK, J., concur.