**C. DOUGLAS WILSON & COMPANY, a South Carolina Corporation, Appellant,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, PHILADELPHIA, PENNSYLVANIA, Hartford Accident and Indemnity Company, Hartford Connecticut, and St. Paul Fire and Marine Insurance Company, St. Paul, Minnesota, Appellees.**

No. 77–2246.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1978.

Decided Jan. 10, 1979.

---

Wesley M. Walker, Greenville, S.C. (James H. Watson, Joseph E. Major, Leatherwood, Walker, Todd & Mann, Greenville, S.C., on brief), for appellant.

Mason A. Goldsmith, Greenville, S.C. (W. H. Arnold, William M. Hagood, III, Love, Thornton, Arnold & Thomason, Greenville, S.C., on brief), for appellees Insurance Co. of North America.

Frank H. Gibbes, III, Greenville, S.C. (John J. McKay, Jr., Rainey, McKay, Britton, Gibbes & Clarkson, Greenville, S.C., on brief), for appellees Hartford Acc. and Indem. Co.

H. Donald Sellers, Greenville, S.C. (W. Francis Marion, Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S.C., on brief), for appellee St. Paul Fire and Marine Ins. Co.

Before BUTZNER and HALL, Circuit Judges, and HOFFMAN,* District Judge.

K. K. HALL, Circuit Judge:

C. Douglas Wilson & Co. (Wilson), a mortgage broker, sustained losses in excess of $1,250,000 as a result of the mishandling of certain HUD/FHA loans by an employee, and filed a declaratory action in district court against its three defendant insurance carriers to fix their respective liabilities. On motion for nonsuit at the close of plaintiff's evidence, the district court dismissed

* Walter E. Hoffman, Senior District Judge, Eastern District of Virginia, sitting by designation.

St. Paul Fire and Marine Insurance Company (St. Paul) as a party. At the close of all the evidence, the jury returned a verdict for plaintiff against both the Insurance Company of North America (INA) and Hartford Accident and Indemnity Company (Hartford). The district court then granted a motion for judgment n. o. v. We affirm.

To resolve the question of liability in this case we must focus attention upon the date of March 25, 1973, the dishonesty of J. L. Barksdale, then a vice president of Wilson, and the manner in which Wilson reacted to the discovery of Barksdale's dishonesty.

St. Paul was the fidelity bond insurer prior to March 25, 1973. INA and Hartford were the insurers after that date.[1] The St. Paul policy provided coverage only for losses *discovered* during the policy period.[2] The INA and Hartford policies expressly excluded coverage for losses resulting from the dishonest acts of any employee which occurred after the employer had knowledge of the employee's dishonesty.[3] The district court ruled, as a matter of law, that St. Paul was not liable because Wilson discovered its losses after the St. Paul policy had expired, and that INA and Hartford were not liable because Wilson knew of the dishonesty of its vice-president before the effective date of their policies.

The facts may be stated briefly. Wilson is a wholly-owned subsidiary of NCNB Corporation. The genesis of this lawsuit is found in various loan practices of J. L. Barksdale, then vice-president of Wilson in charge of all multi-family construction loans insured by the Secretary of HUD through FHA. On March 16, 1973, Robert Shaw, NCNB's credit review officer, discovered during a routine audit that Barksdale was advancing construction monies to contractors before getting prior approval from HUD, which prior approval was one condition to participation in the HUD/FHA program. Shaw confronted Barksdale, who candidly admitted this practice; he also admitted that he falsely certified the dates and amounts of advances on standard HUD forms, to make those dates and amounts conform to the actual dates and amounts approved by HUD. Barksdale justified this practice by saying that " . . . all construction lenders in FHA projects were handling these [pre-advances and false certifications] on this basis and . . . FHA, or HUD, was aware of this practice. . . "

Shaw, concerned about the situation, wrote a detailed memo to Wilson officials on March 18, 1973. A meeting was held the following day to discuss the situation, but no action was taken against Barksdale, al-

1. The St. Paul policy provided $1,000,000 coverage with $500 deductible. The INA policy provided $8,000,000 coverage with $50,000 deductible. Wilson purchased the Hartford policy, which provided $50,000 coverage with $1,000 deductible, to fill this gap in the INA coverage.

2. The St. Paul policy contained the following:
ENDORSEMENT OR RIDER No. 3

* * * * * *

"RIGHTS AFTER TERMINATION OR CANCELLATION"
"Section 17. At any time prior to the termination or cancellation of this bond as an entirety, whether by the Insured or the Company the Insured may give to the Company notice that it desires under this bond an additional period of twelve months within which to discover loss sustained by the Insured prior to the effective date of such termination or cancellation and shall pay an additional premium therefor. Upon receipt of such notice the Company shall give its written consent thereto; . . ."

3. The INA policy provided:
TERMINATION OR CANCELLATION

* * * * * *

Section 10.

* * * * * *

This bond shall be deemed terminated or cancelled as to any Employee—(a) as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee, . .
The Hartford policy provided:
PRIOR FRAUD, DISHONESTY OR CANCELLATION
SECTION 6. The coverage of this Bond shall not apply to any Employee from and after the time that the Insured or any partner or officer thereof not in collusion with such Employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise, . . .

though the practice of making pre-advances "came to a screeching halt." Wilson did not notify St. Paul, who was then the insurer on a fidelity bond, of Barksdale's actions, nor did it notify INA or Hartford, who six days later were to become the insurers. Various Wilson officials testified at trial that, at the time, they considered Barksdale's actions to be bad business practice and poor judgment, but did not consider them dishonest or illegal. Significantly, Wilson argued vigorously both at trial and on appeal that no losses were occasioned by Barksdale's practice of making pre-advances.[4]

During the week of April 23, 1973, Wilson discovered that Barksdale had failed on several occasions to secure letters of credit which Wilson was obligated to hold in lieu of cash escrows required by FHA for its approval of permanent loan insurance for completed housing projects. As in the case of the pre-advances, Wilson discovered that Barksdale had falsely certified on FHA forms that he had in fact secured these letters of credit. Wilson considered these acts, which had the effect of exposing Wilson to substantial losses, dishonest and illegal, and immediately fired Barksdale and notified St. Paul, INA and Hartford of a potential claim. Wilson eventually suffered over $1,250,000 in losses due to Barksdale's failure to secure the letters of credit, and this action was filed in district court to determine which if any of the three insurers were liable for the losses.

*The INA and Hartford Policies*

Both the INA and Hartford policies provided that coverage was deemed terminated or cancelled as to any employee as soon as the Insured had knowledge that the employee had committed fraudulent or dishonest acts. Wilson admits, "with the benefit of hindsight," that Barksdale's false certification to HUD of the dates and amounts of pre-advances was a dishonest act, but insists that at the time it reasonably considered this to be merely poor judgment and bad business practice. INA and Hartford argue that Barksdale's false certification of the pre-advances was dishonesty as a matter of law, and that Wilson had knowledge of this employee dishonesty before March 25, 1973, when the INA and Hartford fidelity bonds became effective. This would mean that, as to Barksdale, coverage under the bonds never went into effect.

Wilson's argument hinges upon the distinction it attempts to make between Barksdale's false certification of pre-advances and his false certification concerning the letters of credit; the former, it urges, is "technical only," while the latter poses a much higher risk of loss exposure to Wilson. The district court found, and we agree, that this is a distinction without a difference. In both instances Barksdale certified false information on a HUD or FHA form, which form stated that criminal penalties attached for such false certifications,[5] for the purpose of influencing HUD or FHA actions. The smaller potential for loss exposure to Wilson does not render one violation "technical."

Wilson vigorously attempts to factually distinguish the authority cited by the district court, but we are persuaded by the reasoning in *City Loan and Savings Co. v. Employers' Liability Assurance Corp., Ltd.*, 249 F.Supp. 633, 656 (N.D.Ohio 1964) (citations omitted).

> 'Dishonesty', as used in a fidelity bond, is to be interpreted according to its usual and ordinary meaning. To constitute dis-

4. Had Wilson anticipated that losses might result from the pre-advances, it could have elected a twelve-month extension of the St. Paul policy then in effect. See footnote 2, *supra*.

5. The forms contained the following language: U.S. Criminal Code, Section 1010, Title 18, U.S.C., "Federal Housing Administration Transactions", provides in part:

> "Whoever, for the purpose of . . . influencing in any way the action of such Administration . . . makes, passes, utters, or publishes any statement, knowing the same to be false, . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both."

honesty, the conduct need not amount to a crime and need only involve bad faith or a want of integrity or untrustworthiness or a disposition to lie or cheat or a faithlessness to a trust. To constitute dishonesty, there need not be an intent to profit or to cause a monetary loss to the employer.

Since we conclude that Barksdale's false certification of pre-advances constitutes dishonesty as a matter of law and that Wilson had knowledge of it before the inception of the INA and Hartford policies, and since Wilson concedes that it did not notify INA and Hartford of Barksdale's dishonesty, we sustain the conclusion of the district court that under the terms of their respective policies INA and Hartford cannot be held liable for Wilson's losses. *See* footnote 3, *supra.*[6]

*The St. Paul Policy*

Wilson, INA and Hartford join in arguing that the district court erred in dismissing St. Paul from the case at the close of plaintiff's evidence. All of that evidence indicated that Wilson's losses were occasioned solely by Barksdale's failure to secure the letters of credit[7] and that this failure was not discovered until the week of April 23, 1973. The St. Paul policy provided coverage only for losses discovered during the policy period; the policy expired on March 25, 1973.

Defendants INA and Hartford were prepared to offer the testimony of J. L. Barksdale that Wilson had discovered the missing letters of credit, and thus its loss, before March 25, 1973. However, they did not file a cross-claim against St. Paul. The district court held that, even given the relaxed burden of proof in a declaratory action, it was the plaintiff's burden—not INA's or Hartford's—to establish St. Paul's liability. See 6A Moore's Federal Practice ¶ 57.31, at 266–71 (2d ed. 1974). Wilson presented no evidence upon which St. Paul could be held liable. INA and Hartford, who did not file a cross-claim against St. Paul and thus did not assume the role of plaintiff as against St. Paul, should not be heard to complain.

*Conclusion*

We find Wilson's argument that the district court failed to consider the materiality of Wilson's non-disclosure to the insurers to be refuted both by the language in the court's opinion and by the evidence. The fact of an employee's known dishonesty cannot be non-material where the insurer is underwriting a fidelity bond. *Graham v. Aetna Insurance Co.,* 243 S.C. 108, 132 S.E.2d 273 (1963), relied upon by Wilson, is inapposite.

We agree with the district court's analysis of the law of waiver and estoppel and with his conclusion that these defenses are unavailing where, as here, the effect would be to add to or extend policy coverage and, in any event, the defenses have no support in the evidence.

In light of our holding that neither INA nor Hartford may be held liable for Wilson's loss because of Wilson's non-disclosure of employee dishonesty, we need not consider the additional issue raised by Hartford

6. The dissent notes that all of Barksdale's acts concerning the letters of credit occurred *before* Wilson's discovery of his dishonesty, and from this argues that we are giving the termination clauses retroactive effect by holding that INA and Hartford have no liability for losses resulting from these prior acts. *See* pp. 1290–1291 *infra.* We agree that in the usual situation, where the same insurer is on the risk throughout the entire time period at issue, coverage for losses resulting from acts occurring before the employer's discovery of employee dishonesty would not be affected by subsequent operation of the termination clause. But here, the dissent would have INA and Hartford assume liability for losses resulting from acts committed before the inception of their respective policies by an employee who was *never* within the coverage of the policies. This is an untenable result.

Had Wilson elected to extend its coverage under the St. Paul policy, its option as a matter of right, *see* note 2 *supra,* St. Paul would have been liable for the after-discovered losses.

7. Upon questioning at oral argument, Wilson's counsel continued to insist that it sustained no losses as a result of the pre-advances, and that there was no causal relationship between the pre-advances and the ultimate losses.

of whether it may not be held liable because its coverage is written on a "loss sustained" basis rather than on a "loss discovered" basis.

The unfortunate position in which Wilson finds itself was occasioned in part by sheer bad luck in timing as to the change in insurers and in part by the poor judgment of its own officers. However, mindful of Justice Holmes' admonition, we cannot use this hard case as a vehicle to make bad law. Each issue raised in this appeal is analyzed at length in the district court's opinion, and we affirm on the basis of that opinion.

*AFFIRMED.*

WALTER E. HOFFMAN, District Judge, concurring in part and dissenting in part:

I join my colleagues in affirming the action of the district court in sustaining a motion for a directed verdict in favor of St. Paul Fire and Marine Insurance Company (St. Paul) made at the conclusion of plaintiff's evidence where no cross-claim had been filed.[1] At this point my agreement disappears and I would reverse the judgment n. o. v. entered by the district court and now affirmed by the panel majority for the following reasons:

(1) The evidence and inferences drawn therefrom were sufficient for the jury to find a verdict for the plaintiff, C. Douglas Wilson & Co. (CDW), which verdict should now be reinstated as to both defendants, INA and Hartford.

(2) As to both fidelity bonds, the district court and the panel majority have misconstrued the effect of, and given retroactive treatment to, the termination and cancellation provisions of the policies. However, this point is immaterial if (1) above is correct.

As I view the facts and inferences fairly drawn therefrom, taken in the light most favorable to CDW which prevailed before the jury, they involve the knowledge which existed in the minds of certain officers and directors of CDW at and immediately prior to March 25, 1973, when the St. Paul's fidelity bond terminated and INA and Hartford assumed the coverage. Did the admitted facts and inferences present an issue of fact, or was it clearly a matter of law which was solely in the province of the court? If it was a mixed question of law and fact, then under the authorities it was for the jury.

On Friday, March 16, 1973, Shaw, an internal auditor and assistant vice-president for NCNB Corporation, the parent company of CDW, was engaged in "a continuing process of my becoming familiar with their (CDW's) procedures, practices in the extension of this type of credit and the administration of these credits." He, and others employed by NCNB, were familiarizing themselves with the operations of CDW, which corporation had been acquired by NCNB in August, 1972. Shaw examined five multi-family project loan files at CDW and discovered that in three files the schedule of loan disbursements for the construction projects, as reported to FHA/HUD, did not match the CDW ledger as to *when* the loan funds were actually advanced. In each instance, however, the total amount of funds advanced was correct. Shaw's concern was that the funds had been advanced prior to the dates certified to FHA/HUD. Shaw immediately confronted J. L. Barksdale, the vice-president of CDW in charge of multi-family project loans, and requested an explanation. Barksdale candidly admit-

1. The question of burden of proof is one of substance, not procedure, and is governed by the substantive law of the case in a diversity action. *Cities Service Oil Co. v. Dunlap*, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196 (1939); *Palmer v. Hoffman*, 318 U.S. 109, 117, 63 S.Ct. 477, 87 L.Ed. 645 (1943); *Dick v. New York Life Ins. Co.*, 359 U.S. 437, 446, 79 S.Ct. 921, 3 L.Ed.2d 935 (burdens of proof are substantive). It is clear in the present case that plaintiff (CDW) at all times contended, and still contends, that the discovery of any dishonest act occurred *after* the crucial date of March 25, 1973. Since South Carolina, in a declaratory judgment action, requires the plaintiff to sustain its burden of proof in the same manner as in an ordinary civil action, *Martin v. Cantrell*, 225 S.C. 140, 81 S.E.2d 37 (1954), I join the panel majority in this affirmance. See also: *National Bank of South Carolina v. American Surety Co. of New York*, 67 F.2d 131 (4th Cir. 1933).

ted that the FHA figures were incorrect, but explained that this was a common practice in such projects due to the administrative delays by FHA/HUD in getting approval to advance funds and, he further stated, FHA/HUD was aware of the practice.[2] Indeed, it sometimes took three to four weeks for a request for payment to be approved by FHA/HUD.

Shaw's conference with Barksdale occurred late Friday afternoon. He did not accept Barksdale's explanation at face value. On Sunday, Shaw prepared a memo for his superior, Addison Reese, the chairman of NCNB. On Monday, March 19—six days prior to the termination of the St. Paul fidelity bond—Shaw met with Robert Cashion, head of NCNB's mortgage banking subsidiaries and chairman of CDW, along with Calvin Ridgeway, president of CDW.[3] Shaw presented to these officers his memo which described the practice of advancing funds prior to FHA/HUD approval. As noted, the memo demonstrated that figures submitted to FHA/HUD contained incorrect dates and amounts. All parties agreed that preadvancing funds was a questionable business practice which exposed CDW to potential liability if FHA/HUD should approve a sum less than that advanced. The parties further agreed that Ridgeway would return to the CDW office in Greenville, South Carolina, and there review all the FHA/HUD loans to determine the extent of CDW's exposure to potential losses.[4] The practice of preadvancing funds came to a "screeching halt" as of March 19, 1973.

Cashion followed, on March 20, 1973, with a memo to Shaw which again referred to the preadvances. At no time did he suggest or intimate that there had been a dishonest or fraudulent act on the part of Barksdale. In fact, none of the officers or directors ever considered Barksdale's acts as dishonest or fraudulent, other than by way of hindsight when the subsequent losses involving letters of credit were discovered. Of course, the jury was not required to believe these officers and directors, but apparently it did by its verdict.

The fact that CDW was adequately[5] protected by a fidelity bond issued by St. Paul in 1971 and in effect until March 25, 1973, and that no consideration was given reporting Barksdale's acts to St. Paul, is a further inference that the officers and directors did not consider Barksdale's acts as dishonest or fraudulent.

During this entire period CDW was protected from employee dishonesty by the "Mortgage Banker's Blanket Bond" issued by St. Paul and acquired in 1971 when

2. There is no suggestion that anyone with CDW, other than Barksdale, knew all the regulations and procedures of FHA/HUD in handling such matters. It is a fair inference to draw that Barksdale was aware of the handbook covering the responsibilities of HUD field officers during the construction period of an insured mortgage. On the first page of the handbook there appears:

*Type and Amount of Advances.* If the application is for an initial advance of mortgage proceeds, the Field Office Director will determine that all deposited funds held in escrow (paragraph 1–1) have been disbursed. If it is for a second or a later advance, the mortgagee must state the cumulative amount of all advances made to the mortgagor, including the advance for which approval is being requested. This total is sometimes at variance with the total amount of advances approved, either because the mortgagee has advanced funds without HUD–FHA approval or because the stated total is incorrect. Any such variance must be accounted for and satisfactorily adjusted.

The HUD handbook is only important in that it supports Barksdale's comments to Shaw that FHA/HUD had knowledge of the practice of mortgagee's advancing funds prior to approval by FHA/HUD. Shaw admitted that he never looked at the reverse side of the Request for Final Endorsement form which contained a warning as to possible criminal violations.

3. Ridgeway died prior to trial and did not testify by deposition.

4. When Shaw returned to Greenville on April 16–17, 1973, he learned that no work had been done in determining the amount of preadvances (or over-advances) on the FHA/HUD projects. He then made a detailed inspection of all files and found that the over-advances aggregated more than $575,000. By this time the INA and Hartford bonds were in effect.

5. The St. Paul bond afforded coverage to the extent of $1,000,000 with a deductible of $500.

CDW was an independent corporation. When, in August, 1972, NCNB acquired the stock of CDW, NCNB elected to continue the St. Paul bond in effect until it expired on March 25, 1973.[6] On that date CDW became an insured under NCNB's blanket fidelity bonds. NCNB and its subsidiaries were insured with INA in the amount of $8,000,000 with a $50,000 deductible. NCNB also had, as of March 25, 1973, a supplemental bond with Hartford with $50,000 coverage and $1,000 deductible.

All of the bonds issued by the three insurance companies were "discovery" bonds, i. e., the particular company would be liable at the time of the discovery of the loss, not at the time the loss actually occurred.[7] CDW never suffered a proven loss resulting from Barksdale's unauthorized preadvances or false certifications to FHA/HUD. He continued to be employed by CDW until April 23, 1973. No reprimand was ever issued to Barksdale although he was instructed to desist his prior actions with respect to preadvances or over-advances.

On April 23, 1973, the officers of CDW learned of a separate problem involving Barksdale. A customer informed the officers that his construction company would become insolvent if it did not receive an immediate loan of $1,000,000 working capital. The customer added that CDW might as well authorize the loan since letters of credit drawn on North Carolina National Bank, another NCNB subsidiary, would be called if his company became insolvent. CDW's officers were shocked to receive this information. They confronted Barksdale who admitted that he had never obtained the letters of credit to secure the loan. That night Barksdale's resignation was received and accepted effective April 27, 1973, and the fidelity companies were notified. Barksdale later entered pleas of guilty to three counts of falsely certifying to the FHA that letters of credit had been obtained from lending institutions in connection with FHA projects. Barksdale was neither charged nor indicted for authorizing the preadvances of funds or the false certification on the forms submitted to FHA/HUD relative to the preadvances.

By reason of the missing letters of credit, CDW sustained a loss of approximately $1,250,000. Of course, when the facts regarding the missing letters of credit were discovered, the "hindsight" of Barksdale's prior activities branded him as dishonest.[8] But, as noted, the crucial date is what was known prior to noon on March 25, 1973. When this action was brought, St. Paul defended on the ground that the dishonest act of Barksdale was not discovered prior to noon on March 25; INA and Hartford contended otherwise.[9] As ably stated by Judge

6. It may be that in August, 1972, when the stock of CDW was acquired by NCNB and CDW became a wholly-owned subsidiary, INA and St. Paul may have afforded duplicate coverage to CDW, but the case was not filed nor tried on this theory.

7. Hartford insists that its bond was issued on a "loss sustained" basis. This would be a valid defense as the loss was clearly sustained during the existence of the St. Paul policy but for the provisions of General Agreement C of the Hartford bond which reads:

> If the coverage of this Bond is substituted for any prior bond or policy of insurance carried by the Insured or by any predecessor in interest of the Insured, which prior bond is terminated, cancelled or allowed to expire as of the time of such substitution, the Underwriter agrees that the bond applies to loss which is discovered in Section 1 of the Conditions and Limitations and which would have been recoverable by the Insured or such predecessor under such prior bond or policy except for the fact that the time within which to discover loss thereunder had expired. . .

Since Hartford's bond does not clarify the meaning of the word "substitution," under the facts of this case Hartford was the substitute for St. Paul to the extent of the limits provided.

8. Even after the missing letters of credit came to light, the Acting Regional Director of HUD, speaking through Clifton G. Brown, the Area Director, by memo dated May 4, 1973, characterized Barksdale's prior activities as "poor judgment" without "evidence of, or intent of, monetary gain or personal betterment to Mr. Barksdale." As late as May 18, 1973, Addison Reese wrote a memo commending Shaw for first running up "the warning signals."

9. There were other defenses asserted but they are not material to the issues now before the court, including the fact that INA and Hartford

Chapman in his charge to the jury, "But the defendants [INA and Hartford] contend that the bonds did not cover Barksdale because C. Douglas Wilson knew that Barksdale had committed a dishonest act [with respect to the unauthorized preadvances and false certification to FHA/HUD] and C. Douglas Wilson did not advise the bonding company of this dishonest act prior to the effective date of the policy, March 25th, 1973. Defendants further contend that the management of C. Douglas Wilson approved of or acquiesced in—that means went along with—the actions of Barksdale and may not now recover."

By his charge, to which there was no exception of substance,[10] Judge Chapman also directed the jury to consider:

> Third, did the act of making false certifications as to pre advances or other advances represent a false or a dishonest act?
>
> And Fourth, if you find that such certification of pre advances or over advances was a dishonest act, should a reasonable employer, under the same circumstances and with the same facts and at the same time, have realized that such certifications of pre advances and over advances were dishonest and fraudulent?

By his order of July 8, 1977, entering judgment n. o. v. in favor of INA and Hartford, Judge Chapman effectively reversed himself and, in substance, concluded that the plaintiff's case should never have gone to the jury.[11] He acknowledged that the burden of proof rested upon the defendants to establish that CDW knew of Barksdale's dishonest act prior to the effective date of the INA and Hartford policies, to-wit, March 25, 1973. However, he concluded that "the verdict of the jury is against the clear weight of the evidence and should be set aside." Conceding as I must that the weight of the evidence may preponderate and, if trying the case without a jury, I may have arrived at the conclusion that the plaintiff should not prevail, I cannot agree that a jury question was not presented. Effectively, Judge Chapman held that the "false certifications made by Barksdale and others at his direction on the Request for Final Endorsement cannot be considered as anything but dishonest" and that this is a matter of law. Stated otherwise, all false certifications constitute a dishonest act as a matter of law.

Judge Chapman also held: "There can be no distinction between the false certification on the Mortgagee's Certificate and the false certification on the Request for Final Endorsement. If one is dishonest, then the other necessarily is also." He rested his decision not on the question of preadvances or over-advances but on CDW's knowledge of the false certifications prior to March 25 and said that CDW had knowledge of these certifications which were dishonest as a matter of law.

The meaning of the word "false", used almost exclusively in cross-examination of the officers of CDW and emphasized by the lower court and panel majority opinions, is susceptible of more than one interpretation. In one sense it is defined by Webster's Third New International Dictionary as "dishonest", "deceitful" and "deceptive"; in another sense it is referred to as "erroneous", "incorrect", "defective", "imprudent" and "unwise". And the definition of the word "certification" does not essentially assist in the solution of the problem. To us, as lawyers and judges, we are prone to imply the criminal aspects of "dishonesty". To others, as laymen and business people, the words of dishonesty and criminal responsibility are not nearly so conclusive. This is

did not issue their riders attaching coverage for CDW until after these two companies had full knowledge of Barksdale's activities. The district court declined to let the issues of waiver and estoppel to be submitted to the jury.

10. Plaintiff took exception for the reason that Judge Chapman failed to tell the jury that the duty to disclose was relative to a "dishonest act which was material to the risk." Defendants took no exceptions. As the jury found for the plaintiff, any omission as to materiality is of no consequence.

11. Judge Chapman wrote an excellent opinion. My disagreement is confined to the fact that a jury question was presented.

the reason that the lower court correctly charged the jury on the "reasonable man" test.

I

Under long-standing principles of insurance law, the question of whether an act is "dishonest" or whether a reasonable man should have perceived an act to be dishonest, is for the jury. The problem arises in several contexts. An employer (insured) will allege that a certain act on the part of an employee was dishonest in order to bring a loss within the coverage of a fidelity bond. Likewise, an insurance company will endeavor to terminate coverage under the policy by attempting to show that an employer had knowledge of a dishonest or fraudulent act by an employee prior to the dishonest act which occasioned the loss. The insurance company, upon whom the burden of proof rests to prove this affirmative defense, will attempt to label the prior act as "dishonest", rather than merely unwise, negligent, poor business practice or lacking in the exercise of good judgment, in order to defeat coverage.[12] Finally, the question of when a dishonest act was first discovered may become important in determining whether an insured was in compliance with the notice provisions of a policy.

The case law and authorities are in substantial agreement as to the role of the jury in determining whether an act is dishonest. 13 *Couch on Insurance,* 2d, § 49:231, states:

> Whether the insured had such knowledge as required him to give notice as stipulated in the policy is for the jury where some evidence tends to show the required degree of knowledge. Whether or not the employer discovered a loss is generally a jury question, and the question whether the insured acquired knowledge from which he might reasonably conclude that his employee had been committing fraudulent and dishonest acts is a mixed question of law and fact to be submitted to the jury.[13]

See also: 11 Appleman, *Insurance Law and Practice,* § 6978, saying:

> Whether or not the employer prior to the defalcation upon which an action is based had obtained knowledge of dishonest acts was a question of fact.

In a frequently cited and leading case on the subject, Chief Judge Cardozo, later Mr. Justice Cardozo, while sitting with the Court of Appeals of New York, held that determination of the nature of an act is for the jury. *World Exchange Bank v. Commercial Casualty Insurance Company,* 255 N.Y. 1, 173 N.E. 902 (1930), involved a teller who paid funds to a depositor of the bank against uncollected items of deposit in violation of a rule of the bank. The teller believed the items, which were still in the course of collection, to be good. A loss of nearly $23,000 was suffered as a result of the teller honoring the depositor's checks. The bank sued the fidelity insurance carrier on a bond which insured against loss resulting from a dishonest *or* criminal act by an employee. The bank obtained a jury verdict. The Appellate Division reversed and ordered a new trial. The Court of Appeals reversed the Appellate Division and, speaking through Chief Judge Cardozo, held that the teller's acts could not be held to be dishonest as a matter of law, saying:

> We think the quality of the act is not so obvious and determinate as to exclude opposing inferences. . . . Criminal the act was not, unless done with criminal intent. . . . The presence of that

12. In argument before this court, counsel for INA stated that if the employer learned, or should have known, that an employee had lied, this would be a dishonest act and coverage would not attach as a matter of law. I cannot approve of such a strained construction of fidelity bond provisions. Thus, according to INA, if any employee, with knowledge of his employer, had falsified the hour he returned from lunch, or some other trivial detail, this would be a dishonest act and there would be no coverage as to an after-discovered loss.

13. The present case was tried under South Carolina law which, in this diversity action, is binding upon us. Although presented in a different context, *Planter's Savings Bank of Greer v. American Surety Co.,* 177 S.C. 363, 181 S.E. 222 (1935), intimates that the timing of notice required for the discovery of a dishonest act is for the jury.

intent is not, in the setting of these circumstances, an inference of law. The question is perhaps closer whether the act within the meaning of the policy must be said to be "dishonest", for dishonesty within such a contract may be something short of criminality. . . . The appeal is to the mores rather than to the statutes. Dishonest, unlike embezzlement or larceny, is not a term of art. Even so, the measure of the meaning is not a standard of perfection, but an infirmity of purpose so opprobrious or furtive as to be fairly characterized as dishonest in the common speech of men. "Our guide is the reasonable expectation and purpose of the ordinary business man when making an ordinary business contract". . . .

If this standard is to govern, we think the quality of the teller's act is for the triers of the facts. He was not acting *lucri causa,* to gain some benefit for himself. He was not acting with the thought of giving anything to anyone, or so the triers of the fact might say. The money was due if the uncollected checks were good. He believed them to be good, for, with or without sufficient reason, he believed them to be certified. He ought, even then, to have consulted his superior instead of venturing to act alone. None the less, his only object was the furtherance of the business without useless fuss and pother. The act was a wrongful one, very likely a technical conversion, certainly a departure from instructions, but in the common speech of men there would be reluctance to describe it as flagitious or dishonest. . . . The act, even if prohibited, was not so radical a departure from the general business of the bank or the functions of the actor as to exact an imputation of dishonest when there was innocence of motive.

In *Federal Deposit Insurance Corporation v. Lott,* 460 F.2d 82 (5th Cir. 1972), one of the issues presented was whether the bank directors had knowledge of the president's previous fraudulent and dishonest conduct. In upholding a jury verdict in favor of the F.D.I.C., as receiver of the bank, the court said:

In applying the test [on a motion for judgment n. o. v.] we must bear in mind what type information the directors must have had in order to nullify Aetna's liability under the bonds. The fact that the directors may have had knowledge of irregularities and violations, i. e., the holding of excessive cash items and exceeding the legal loan limit, is not by itself sufficient to trigger the bank's obligation to notify Aetna. . . . [N]otice is not required when the obligee merely suspects or has reason to suspect wrongdoing. . . .

This issue was particularly well suited for jury determination and upon review of the evidence we think reasonable men might have reached different conclusions as to its outcome. . . . Viewing this evidence in favor of the verdict as true and giving it the benefit of all permissible inferences that help sustain the jury's decision, we find it sufficient to support the jury's findings.

As stated by Cardozo, a party need not be technically guilty of a criminal offense in order to come within the provisions of a policy indemnifying against losses resulting from criminal acts. Conversely, as stated in 13 *Couch on Insurance,* 2d, § 46:251:

It has been held that acts of an employee, which, while technically illegal, are not regarded by the insured as dishonest or as a default on the part of the employee, do not come within a provision of the policy to the effect that the insurer shall be liable only as to losses occurring through dishonest or fraudulent acts prior to the time that the insured had notice of default on the part of the employee.

See also: 9 Appleman § 5668.

Cardozo observed that the teller's act in *World Exchange Bank, supra,* was very likely a technical conversion. It has been held that although a statute makes it a penal offense for a bank president to borrow money from his bank without authorization of the board of directors, it does not follow that loss from such a loan gives

rise to liability under the bond where the bank president had been following this practice for a period of three years and there was no concealment with respect to bank records. As noted by the Wisconsin Supreme Court in holding for the bonding company:

> The surety company did not undertake to guarantee the contractual indebtedness of Sprague to the bank. While these loans and overdrafts were irregular, and no doubt in a sense dishonest, they did not constitute that character of dishonesty within the contemplation of the parties to the bond. *Parker v. Sprague,* 214 N.W. 361, 362 (1927).

Again, in *Bank of Commerce and Trust Co. v. Union Indemnity Co.,* 174 La. 1014, 142 So. 156 (1932), an officer of a bank who withdrew a month's salary in advance from the bank in violation of a state statute which made it a misdemeanor for him to borrow money without authorization, was held not to have committed a dishonest act sufficient to terminate coverage under a blanket fidelity policy. And a *false certification* by an employee that he has made a personal inspection required by the terms of his employment does not constitute dishonesty *as a matter of law, Universal Credit Co. v. United States Guarantee Co.,* 321 Pa. 209, 183 A. 806 (1936), although in this case the jury found for the bonding company.

I mention the foregoing authorities as only a sample of the many cases which could be cited. Judge Chapman and the panel majority emphasize the apparent violation of 18 U.S.C. § 1010 making it a felony to issue a statement, knowing it to be false, for the purpose of influencing in any way the action of FHA. However, if we were confronted with a criminal case involving Barksdale, questions of criminal intent and attempts to influence FHA would give rise to serious issues if confined to the preadvances made by CDW.

The apparent lack of inclination to thoroughly discuss the authorities on the part of the panel majority, and to a somewhat lesser extent by Judge Chapman, prompts the writing of this lengthy dissent. The panel majority relies on *one* case, *City Loan and Savings Co. v. Employers' Liability Assurance Corp., Ltd.,* 249 F.Supp. 633 (N.D.Ohio 1964). Judge Chapman likewise directs his primary attention to this case. The facts in the Ohio case are so totally different that I have difficulty determining the heavy reliance upon it. In that case the insured had clear knowledge of dishonesty on the part of an employee as early as February, 1956, yet allowed the employee to remain in its employ, albeit with instructions to cease the dishonest practice. The insured subsequently acquired knowledge that the practices were being continued, yet still took no action to discharge the employee. Eventually the scheme involving fictitious accounts in funding a car dealer collapsed and a loss of over $350,000 was discovered. The insured then gave notice, in June, 1958, that loss had resulted from the dishonesty of an employee. In a case tried by the court *without a jury* Judge Battisti found that only $548.90 of the total loss could be said to have been incurred prior to February, 1956, when the first dishonest acts were discovered. The evidence of knowledge of the dishonesty of the employee was so apparent to the employer in February, 1956, that the possible liability of the bonding company could not be considered under Judge Battisti's lengthy opinion which covers 26 pages and includes 56 findings of fact and 15 conclusions of law. I am disturbed that an important case such as the one at bar is disposed of by reference to one district court opinion which is factually inapposite.

There is, however, a case relied upon by Judge Chapman which requires some discussion, although it is somewhat the reverse of the situation here presented in that the New Jersey Supreme Court held the bonding company liable as a matter of law in a matter involving false certification. In *Mortgage Corp. of New Jersey v. Aetna Casualty & Surety Co.,* 19 N.J. 30, 115 A.2d 43 (1955), a factual situation similar in some respects to the present case was involved. A mortgage company employed one Harrison to inspect building sites and to make

certifications on the basis of which the mortgage company would disburse loan funds to the borrower. Under the terms of the loan, funds were to be disbursed at various stages of construction. Beginning in 1941 Harrison stopped making personal inspections and began making his certifications on the basis of representations made by the contractor, all without knowledge or permission of the employer. Substantial losses were incurred as a result of the mortgage company's reliance on Harrison's certifications. At the first trial the jury returned a 10 to 2 verdict for the defendant (referred to as "no cause of action"), but the trial court granted a new trial on the ground that reasonable minds could not escape the conclusion that Harrison was guilty of dishonest acts. At the second trial the jury again returned a verdict for the defendant (no cause of action). The trial court then granted judgment n. o. v. for the plaintiff mortgage company. On appeal, the New Jersey Supreme Court noted that fidelity bonds indemnifying employers against dishonest acts of their employees are to be broadly construed. The court attempted to distinguish the case from *World Exchange Bank, supra,* and then held that Harrison's dishonesty clearly fell within the coverage of the policy. However, the court split four to three on this issue and the dissent argued that the particular set of words used in the contract, i. e., "dishonest, fraudulent or criminal act," were manifestly selected to exclude liability for negligence no matter how gross. The dissent then defended the role of the jury in the American system:

> The issue here concerns the primacy of the jury in its constitutional sphere of resolving the facts and the inferences derivable from proved circumstances. It was the exclusive province of that tribunal to assess the proofs and determine whether the elements of fraud or dishonesty within the concept of the contractual indemnity had been established by a preponderance of the evidence. The question of one's intent or belief, of a fraudulent or dishonest design or purpose, is ordinarily in its very nature an inquiry for the jury. . . . And the terms of indemnity, as we have seen, import moral or conscious wrong or delinquency. Only when the proofs fairly and reasonably admit of but one conclusion does the question become one of law for the court. Where the evidence is sufficient to raise the question of intent, it is the duty of the court to submit the question to the jury.

The New Jersey case goes far in holding that the issues of fraudulent and dishonest acts may be for the court. The only pertinent distinction between the case at bar and the New Jersey case is that we are here confronted with the knowledge of the employer which played no part in the judgment n. o. v. in favor of the insured employer in the New Jersey situation.

The opinion of the panel majority and the able opinion of Judge Chapman each fail to discuss the *issue of intent* which, according to law, is critical. I express serious doubts whether Barksdale could have been convicted on a charge involving false certification as to preadvances when his intent is considered without regard to his later discovered defalcation pertaining to the letters of credit. While admittedly a proven criminal act is not required, the issue of intent is very material in determining whether a dishonest act was committed by Barksdale and whether the officers and directors of CDW should have known that the act was dishonest.

The New Jersey case found two juries and three justices in sharp disagreement with two trial judges and four justices over whether false certifications by an individual constituted dishonest acts or something less than dishonesty. While I am inclined to agree with the minority, the differences of opinion reinforce the logic of Cardozo's opinion which was cited by both the majority and dissenting opinions where he said:

> We think the quality of the act is not so obvious and determinate as to exclude opposing inferences. . . . If this standard is to govern, we think the quality of the teller's act is for the triers of the facts. 173 N.E. at 903–4.

It previously has been noted that the insured or the insurer may desire a broad or narrow interpretation of the word "dishonesty", depending upon whether the issue in question is one of coverage under the policy or termination thereof due to prior acts of the employee. We should bear in mind that a fidelity bond "is to be interpreted in light of its nature as a contract of insurance, and in view of its purpose as such, and with a great desire of liberality in favor of the insured against the insurer." *Curran & Treadaway v. American Bonding Co.*, 193 La. 763, 192 So. 335, 338 (1939); *Mortgage Corporation of New Jersey v. Aetna Casualty & Surety Co., supra*, 115 A.2d at 46. And as the Supreme Court has said in *American Surety Company v. Pauly (No. 1)*, 170 U.S. 133, 144, 18 S.Ct. 552, 556, 42 L.Ed. 977 (1898):

> If, looking at all its provisions, the bond is fairly and reasonably susceptible of two constructions, one favorable to the bank and the other favorable to the surety company, the former, if consistent with the objects for which the bond was given, must be adopted, and this is for the reason that the instrument which the court is invited to interpret was drawn by the attorneys, officers, or agents of the surety company. This is a well-established rule in the law of insurance.

At times it would appear that courts apply different rules in determining whether acts prior to coverage were dishonest than they would in finding dishonesty after issuance so as to come within the coverage of the policy. In *Maryland Casualty Co. v. Clements*, 15 Ariz.App. 216, 487 P.2d 437, 442 (1971), the Court of Appeals of Arizona noted that two entirely different issues were involved:

> In determining an employer's knowledge of prior acts, the question usually is not whether in light of the facts, including the employee's subjective intent, the employee's acts were *in fact* dishonest, but rather whether *based upon the facts known to the employer*, the employer should reasonably have perceived the dishonesty. In the coverage situation an entirely different yardstick applies—were the acts *in fact* dishonest?

Judge Chapman held and the panel majority agrees that there can be no distinction between the false certification on the schedule of advances and the false certification regarding the letters of credit. Stated otherwise, if CDW had knowledge prior to March 25 that Barksdale had made false certifications, then CDW had knowledge of prior dishonest acts. This does not necessarily follow and, to a great extent, is dependent upon Barksdale's intent. His false certifications regarding the preadvances are closely analogous to a depositor "floating" checks or a teller accepting checks on accounts he knows have insufficient funds to be covered. In either case the individual may have an interest to defraud the bank or the payee. On the other hand, the individual may fully intend to deposit sufficient funds to cover the check before it is posted. Courts have consistently held that questions of intent such as these are matters for the jury. Barksdale's intent in preadvancing funds on construction loans and falsely certifying same to FHA was not, as a matter of law, a dishonest act as he had no intent to defraud FHA or his employer. In effect, Barksdale was "floating" insurance coverage for the proceeds advanced in expectation that FHA would approve the advancement. The nature of Barksdale's acts should be considered in the context of practices in the mortgage business, rather than being labeled dishonest on what the jury may have deemed a technical violation of a statute.

In the many authorities reviewed only one, the New Jersey case referred to herein, stands out as a principle guiding the facts of this case that these issues may be taken away from a jury as a matter of law. And I would suspect that the desire to compensate the insured in an action against an insurance company may have been the primary reason why the majority took such action in the New Jersey case.

Nor can I believe that the South Carolina Supreme Court, if met with a factually identical problem, would hold that Barks-

dale's initial acts constituted dishonesty as a matter of law. In *Peurifoy v. Loyal*, 154 S.C. 267, 151 S.E. 579, 589 (1930), the court suggested the standard as to how the state of mind of officers and directors of the employer should be treated. That case involved embezzlement by the bank's president and an action was brought on the bank's fidelity bond. The surety company asserted that the bank had failed to give notice within ten days after the discovery of the loss as required by the bond. Thus, the time of discovery of the dishonest act was crucial (as in the present case) to the decision. In summary, the South Carolina Supreme Court said:

> [I]t is clear that neither the cashier nor either of the two directors ever *discovered any loss* within the meaning of the bond. The evidence is that, so far as their knowledge and belief was concerned, they did not think there had been or would be any loss. They believed the matter to be an irregularity, but not a dishonest act. They had implicit faith in Mr. Mauldin, the president of the bank, and at no time does it appear that any one of them felt that he had *discovered a loss* to the bank. To hold that the cashier and these two directors became duty bound to give notice to the surety company that they had *discovered a loss* under the terms of the bond would be to require them to give notice of something they neither knew nor believed.

*Peurifoy v. Loyal, supra,* is not cited, mentioned or discussed in either the opinion of the district court or the opinion of the panel majority. While I realize that *Peurifoy* pertained to the discovery of a loss, whereas here we are involved with the discovery of a dishonest act, I feel that the principles are very similar and I cannot approve of the total lack of discussion of South Carolina authorities which are controlling in this diversity case.

Much of the same effect is *Fidelity & Deposit Co. of Maryland v. People's Bank of Sanford*, 72 F.2d 932 (4th Cir. 1934), a nonjury case, in which Judge Parker said:

> The defendant would have the worst construction put on that transaction and conclude therefrom that the cashier was dishonest and unworthy of confidence or trust; that the bank had actual knowledge thereof, and fraudulently withheld the information from the innocent surety, which amounted to a fraud on it, warranting the court in canceling the bond. It is unreasonable to conclude that the bank would have retained him as cashier from 1921 to 1927 and clothed him with the full control of the bank if it thought he was unworthy of trust.[14]

The panel majority and Judge Chapman have disregarded the admonition of our great Chief Judge Parker when, in *Burcham v. J. P. Stevens & Co.*, 209 F.2d 35 (4th Cir. 1954), he said:

> It is well settled that on a motion for a directed verdict or on motion for judgment n. o. v. based on such motion, the evidence must be considered in the light most favorable to the party against whom the directed verdict or the judgment n. o. v. is asked, that any conflict in evidence must be resolved in his favor and that every conclusion or inference that can be legitimately drawn therefrom in his behalf must be drawn.

The guiding principles have been violated by the panel majority opinion of affirmance.

## II

Assuming *arguendo* that CDW officers had knowledge of dishonesty on the part of Barksdale prior to March 25, it is still in error to hold that INA and Hartford have no liability on their bonds by reason of their contract provisions. The district court based nonliability on two theories: 1) the termination clauses in each bond terminate coverage as to any employee immediately upon discovery by the employer of any dishonest or fraudulent conduct by that em-

14. There is, as a matter of law, a presumption of honesty. A mere suspicion of dishonesty cannot be equated with the discovery of dishonesty. *Fidelity & Casualty Co. of New York v. Bank of Timmonsville*, 139 F. 101 (4th Cir. 1905).

ployee, and 2) under a warranty theory the insured has a duty to disclose material circumstances affecting the situation of the parties which are within the knowledge of the employer procuring the bond. Neither theory is applicable to the circumstances of this case.

The INA bond contains the following provisions for "Termination or Cancelation":

> Section 10.
>
> . . . . .
>
> This bond shall be deemed terminated or canceled as to any Employee—(a) as soon as the insured shall learn of any dishonest or fraudulent act on the part of such Employee, without prejudice to the loss of any Property then in transit in the custody of such Employee, or (b) fifteen days after the receipt by the insured of a written notice from the Underwriter of its desire to terminate or cancel this bond as to such employee.

The Hartford bond contains a somewhat different provision:

> Section 6. The coverage of this bond shall not apply to any Employee from and after the time that the Insured or any partner or officer thereof not in collusion with such Employee shall have knowledge or information that such Employee has committed any fraudulent or dishonest act in the service of the Insured or otherwise, whether such act be committed before or after the date of employment by the Insured.
>
> If, prior to the issuance of this Bond, any fidelity insurance in favor of the Insured or any predecessor in interest of the insured and covering one or more of the Insured's Employees shall have been canceled as to any such Employees by reason of the giving of written notice of cancelation by the insurer issuing such fidelity insurance, whether the Underwriter or not, and if such Employees shall not have been reinstated under the coverage of such fidelity insurance or superseding fidelity insurance, the Underwriter shall not be liable on account of such Employees unless the Underwriter shall agree in writing to include such Employees within the coverage of this bond.[15]

The defendants contend that Barksdale was excluded from the bond under the exclusion provisions of the policy. Section 1 of the INA bond covers nine paragraphs of exclusions, none of which apply to this case. Section 2 of the Hartford bond contains a more limited exclusion not applicable to this case. However, while I do not regard Barksdale's situation as excluding him from coverage, I agree that the Conditions and Limitations are covered by Section 10 of the INA bond, and Section 6 of the Hartford bond.

The Hartford bond likewise contains a further provision as follows:

> Section 12. This Bond shall be deemed canceled as to any Employee: (a) immediately upon discovery by the Insured, or by any partner or officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee; or (b) at noon, standard time as aforesaid, upon the effective date specified in a written notice mailed to the Insured. . . .

The language of the two Hartford clauses differs in one respect: Section 12 refers to cancelation of the bond, whereas Section 6 refers to coverage of the bond. The legal effect of the two clauses and the INA clause is probably the same. As soon as an employer learns that an employee has committed a dishonest act, that employee is no longer covered by the bond as to losses which may arise from *subsequent* dishonest acts of that employee. This is the obvious purpose of these clauses. Does it automatically protect a subsequent surety for *prior* acts which occurred when the bond was not in effect?

15. There is no contention in this case that St. Paul, the predecessor to INA and Hartford, ever gave any notice of cancelation as to Barksdale. The section is quoted as it tends to show that the noncoverage provision was intended to apply to after-discovered dishonesty.

In 13 *Couch on Insurance*, § 46:247, it is said:

> Apart from any question of giving notice of default, an employer who retains in his employment an employee who has been guilty of such conduct as constitutes a breach of the bond, and conceals the latter fact from the surety, cannot thereafter hold the fidelity insurer responsible for *subsequent defaults* of the employee. That is to say, where there is a continuing suretyship for the faithful discharge of duty, if the employer discovers that his employee or agent has been guilty of dishonesty in the course of the service, and thereafter continues him in such service, without notice to and the assent of the surety, express or implied, to such course, the surety is not liable for any loss arising from such dishonesty *during such subsequent service.* More simply stated, the insured may be barred or estopped from claiming recovery on the bond where it has knowledge of the course of conduct of the bonded employee which occasioned the loss. And an insurer is not liable for loss from any acts of fraud or dishonesty *committed by the employee after the employer becomes aware* of any act which may be made the basis of a claim. (Emphasis supplied)

Any other result would defeat the purpose of insurance and base recovery on chance. If an employer should discover on March 1 that an employee committed a dishonest act on February 1 which caused no loss, and later discover on April 1 that the same employee had committed a separate act of dishonesty on January 1 that caused a loss of $1,000,000, it would be nonsensical to say that coverage as to that employee terminated on March 1 with the discovery of the first dishonest act. In the instant case all of Barksdale's dishonest acts concerning the letters of credit occurred long prior to the discovery by Shaw that Barksdale had made false certifications to FHA regarding the preadvances. It follows that the termination clauses, which act only prospectively, could have no effect on liability for losses which had already been incurred by the insured as a result of Barksdale's dishonesty.

The two cases cited by the court below to support its theory of termination are inapplicable. *First National Bank of Sikeston v. Transamerica Ins. Co.*, 514 F.2d 981 (8th Cir. 1975), involved a continuing pattern of wrongdoing similar to that in *City Loan & Savings Co., supra. Ritchie Grocer Co. v. Aetna Casualty & Sur. Co.*, 426 F.2d 499 (8th Cir. 1970), disallowed recovery for dishonesty by an employee who was known to have broken and entered a business for the purpose of stealing money and property prior to his employment by the insured and prior to the purchase of the fidelity bond. Other cases have more clearly distinguished between losses which occurred prior to the first discovery of dishonesty and those which occurred subsequent to that discovery. See *Lac Qui Parle Town Farmers Union Fire Ins. Co. v. Remsberg,* 195 Minn. 402, 263 N.W. 455, 456 (1935); *Los Angeles Athletic Club v. United States Fidelity & Guaranty Co.,* 41 Cal.App. 439, 183 P. 174, 178 (1919); *Perpetual Building & Loan Ass'n v. United States Fidelity & Guaranty Co.,* 118 Iowa 729, 92 N.W. 686, 688 (1902).

There remains for discussion the warranty theory, which would deny recovery to the insured for failure to disclose material facts concerning prior dishonest acts on the part of an employee. The INA bond contains the following warranty clause:

> No statement made by or on behalf of the Insured, whether contained in the application or otherwise, shall be deemed to be a warranty of anything except that it is true to the best of the knowledge and belief of the person making the statement.

A concealment in the law of insurance is the designed and intentional withholding of any fact, material to the risk, which the insured in honesty and good faith ought to communicate. Furthermore, in the absence of fraud, a failure of insured to disclose a fact with reference to which no questions are asked is not such a concealment as will

void a policy. *Graham v. Aetna Insurance Co.*, 243 S.C. 108, 132 S.E.2d 273, 274–75 (1963).[16]

The evidence would support a jury verdict that the insured, to its best knowledge and belief, had no knowledge of prior dishonest acts on the part of Barksdale. Such a determination is for the jury; the words "knowledge and belief" imply a subjective test as to insured's actual state of mind, rather than an objective, "reasonable man" test. Again, assuming *arguendo* that the insured had actual knowledge of dishonesty, there is still the question of the materiality of the risk. The record in this case does not support a determination that the failure to disclose Barksdale's certifications regarding the preadvances was material to the risk undertaken by INA and Hartford. The practice of preadvancing funds was halted immediately upon discovery, no loss was incurred as a result of the practice, and the practice did not involve any intent to defraud. The insurance companies have not presented evidence sufficient to justify holding as a matter of law that the insured failed to disclose facts material to risk being undertaken by the insurers. The evidence adduced at trial presented a question of fact for the jury. It was error to take the verdict from the jury. I would reverse the judgment of the trial court, both on the facts and on the law, and reinstate the verdict.

---

16. This South Carolina case dealt with a previous fire loss which was not disclosed to the insurance company. It is argued that the issuance of a Blanket Bond requires the application of a different rule. Research does not disclose any South Carolina law making this distinction. In the present case, no advance inquiries were made by INA or Hartford.